## TENNESSEE PRODUCTS & CHEMICAL CORP. v. UNITED STATES.

Civ. Nos. 976, 977.

United States District Court
M. D. Tennessee, Nashville Division.
Nov. 18, 1952.

Waller, Davis & Lansden, Nashville, Tenn., for plaintiff.

James M. Swiggart, Asst. U. S. Atty., Nashville, Tenn., for defendant.

DAVIES, District Judge.

The above entitled consolidated cases were heard before the Court on July 22 and 23, 1952.

The causes were submitted upon the pleadings, evidence, exhibits, and argument of counsel for plaintiff and defendant, and, after due consideration thereof, the Court enters its Findings of Fact and Conclusions of Law, as follows:

### Findings of Fact

1. Plaintiff is a corporation incorporated under the laws of the State of Tennessee, having its principal office and place of business in the City of Nashville, County of Davidson, State of Tennessee, and in the Middle District of Tennessee. Effective June 1, 1947, plaintiff changed its name from Tennessee Products Corporation to Tennessee Products & Chemical Corporation.

2. These two actions which have been consolidated are brought under the "Tucker Act," subparagraph (2) of paragraph (a) of sec. 1346 of Title 28 of the United States Code, effective September 1, 1948, as revised, codified and enacted into law by Act of June 25, 1948, Chapter 646, Public. Law 773.

3. Around the end of the year 1943, Mr. E. A. Adams, Director of the Rural Industries Branch of the War Manpower Commission of the United States Government, suggested to the plaintiff that the plaintiff employ enemy prisoners of war in cutting logs into suitable lengths for chemical wood near Hohenwald, Lewis County, Tennessee, and loading the chemical wood on trucks and cars for transportation to the plaintiff's plant at Lyles-Wrigley, Tennes-

see. Throughout the war said plant of the plaintiff was classified as a munitions plant and its products were on allocation, but despite this the plaintiff's plant was short on the supply of chemical wood necessary to its operation due to the inability of the plaintiff to obtain sufficient free labor in the cutting of chemical wood. Mr. Adams, as representative of the War Manpower Commission, assured the plaintiff that the cost of prisoner of war labor would be equivalent to the cost of free labor performing the same services.

4. Relying on said assurance, the plaintiff entered into negotiations for the employment of prisoner of war labor with Mr. Adams, as representative of the War Manpower Commission, and with various representatives of the United States Army, during which it was agreed that the plaintiff would furnish free to the defendant a camp site near Lawrenceburg, Tennessee, for approximately 300 enemy prisoners of war and would run utilities, such as electric power, telephone and water and sewerage, to the camp site at which point the Government would take the utilities and run them into camp and pay the cost of the utilities; that the plaintiff might have to expend not more than $2500 for labor and materials in building a camp and that the plaintiff would be reimbursed for such housing costs at the rate of 2% per month and would be reimbursed in full for the cost of all utilities used at the camp and paid for by the plaintiff. It was agreed that the Government would put up a security fence and guard towers without assistance from the plaintiff.

5. On or about January 10, 1944, the War Manpower Commission of the United States Government certified plaintiff's need for the employment of a minimum of 150 prisoners of war for a period of twelve months or for the war duration at a price of $2.25 per cord. This certification and the revised certification dated May 4, 1944, are in evidence. In paragraph 8 of the certification it is provided that "the price to be paid is equivalent to the cost of the job if done by free labor at wages prevailing in the locality for similar work."

6. On or about April 17, 1944, the camp was completed, after both the United States Army and the plaintiff had contributed labor and materials to the construction thereof. The cost to the plaintiff of the labor and materials furnished by it for the construction of the camp, exclusive of the cost of the camp site, was $8,353.53.

7. From April 20, 1944, until September 15, 1945, the major portion of the prisoners of war stationed at said camp were employed by plaintiff for the cutting and loading of chemical wood under the following contracts between plaintiff and defendant: W-40-095-PMG-6501, W-40-095-PMG-6517, W-40-095-PMG-6526, and W-40-095-PMG-6530, dated April 20, 1944, January 1, 1945, July 1, 1945, and August 16, 1945, respectively. (Plaintiff's Exhibits B-1, B-2, B-3, and B-4.) During the period covered by said four contracts, from April 20, 1944, until September 15, 1945, the plaintiff paid the defendant the full contract price for all the work performed by the prisoners of war, amounting to a total of $94,082.13.

8. The first of said contracts (Plaintiff's Exhibit B-1), covering the period April 20, 1944, to December 31, 1944, provided in Schedule A, attached thereto, that "transportation will be furnished by the contracting officer from the temporary prisoner of war camp to operation." This was an agreement by the defendant to furnish the transportation of the prisoners of war and the guards from the prisoner of war camp to the work site and return. The uncontroverted proof shows that the defendant breached the contract by failure to transport the prisoners of war and guards as it agreed to do, and it was so conceded in open court by the United States District Attorney.

9. The plaintiff (not the defendant or the defendant's contracting officer) supplied the transportation for the prisoners of war and guards from the temporary prisoner of war camp to the place of operation throughout the term of said first contract (Plaintiff's Exhibit B-1), from April 20, 1944, until December 31, 1944. During such period the plaintiff employed seven trucks and drivers in the transportation of prison-

ers of war and their guards over a distance of approximately forty miles a day on approximately twenty days each month, or a total of 170 days. Plaintiff's average cost for such transportation amounted to $40.66 per day, or a total of $6,912.20.

10. None of said contracts between the plaintiff and the defendant (Plaintiff's Exhibits B–1 to B–4, inclusive) obligated the plaintiff to furnish housing for the prisoners of war employed by it or to furnish any utilities used at the prisoner of war camp, nor did any of said contracts expressly provide that the plaintiff should be remunerated for the cost of housing or utilities furnished by it to the prisoner of war camp. The total amount of $94,082.13 which the plaintiff paid the defendant under said contracts for the employment of prisoners of war was intended by the plaintiff and the defendant to be equivalent to what the cost of the work would have been if such work had been done by free labor at wages prevailing in the locality for similar work. It was not customary for the plaintiff or any other employers in the locality to furnish housing or utilities to free labor engaged in similar work.

11. The War Manpower Commission would never have approved or certified the need for the employment of prisoners of war by the plaintiff if the plaintiff had had to pay any part of the expense of constructing the camp or for utilities furnished the camp since this would have made prisoner of war labor cost more than free labor would have cost the plaintiff.

12. During the period of such employment of prisoner of war labor by the plaintiff, applicable War Department regulations (Plaintiff's Composite Exhibit C) required that wherever it is not customary for the employer to furnish housing and utilities to free labor employed by him, the employer of prisoner of war labor should be allowed a refund or credit of 2% per month of his contribution to the cost for new construction of the housing for prisoner of war labor and should be allowed a refund or credit of all amounts paid by the employer for utilities used at the prisoner of war camp.

13. During the period from April 20, 1944, to August 16, 1945, the plaintiff was required by the defendant to pay for all utilities used at the camp, at a cost to plaintiff of $4,659.14. None of this has been credited or refunded to the plaintiff.

14. An allowance or refund to the plaintiff, based on plaintiff's cost of $8,353.53 for labor and materials used in the construction of the prisoner of war camp at the rate of 2% per month during the terms of said contracts from April 17, 1944, to September 15, 1945, a period of seventeen months, would amount to a total of $2,840.20. No part of this housing allowance has been credited to or paid to the plaintiff.

15. After the plaintiff ceased employing prisoners of war from the defendant, the defendant continued to occupy the prisoner of war camp and the housing facilities thereat from September 15, 1945, until June 15, 1946. In Count 3 of its complaint in Civil Action No. 977 the plaintiff claims that it is entitled to the fair value of such continued use and occupation by the defendant during said nine month's period. It appears, however, that the plaintiff never objected to such continued use of the camp by the Government at a time when none of the prisoners of war were employed by the plaintiff and it appears that the Government furnished some of the labor and materials which went into the construction of the camp.

16. There is no proof to sustain the defendant's counterclaim against the plaintiff in the amount of $312.18.

### Conclusions of Law

1. This Court has jurisdiction of the parties and the subject matter of these actions under the Tucker Act, 28 U.S.C. § 1346(a) (2).

2. The defendant breached the contract between it and the plaintiff by failing to transport the prisoners of war and guards from the prisoner of war camp to the work site, as the defendant contracted to do, from April 20, 1944, until December 31, 1944, under the contract W-40-095-PMG-6501. (Plaintiff's Exhibit B–1.) Un-

der Count 2 of the complaint as amended in Civil Action No. 976, the plaintiff is entitled to recover from the defendant the plaintiff's damages caused by such breach of contract in the amount of $6,912.20 and costs.

3. The defendant and the plaintiff expressly contracted and agreed that the defendant would reimburse the plaintiff for the cost of all utilities furnished to the prisoner of war camp and paid for by the plaintiff and that the defendant would reimburse the plaintiff for the cost of all labor and materials furnished by the plaintiff in the construction of the prisoner of war camp at the rate of 2% per month during the period that plaintiff employed prisoners of war stationed at such prisoner of war camp.

4. Even if there had been no such express contract so to reimburse the plaintiff for the cost of the housing and utilities at the prisoner of war camp paid for by the plaintiff, a contract requiring the defendant so to reimburse the plaintiff would be implied in the facts as found.

5. There was no agreement, express or implied, on the part of the defendant to pay the plaintiff any compensation for the use of the prisoner or war camp after the plaintiff had ceased employing prisoner of war labor and therefore the plaintiff is not entitled to any compensation for the use of said camp by the defendant during the period from September 15, 1945, until June 15, 1946.

6. Under the complaint in Civil Action No. 977 plaintiff is entitled to recover of the defendant the sum of $7,499.34, representing $4,659.14 paid by the plaintiff for utilities in connection with the operation of said prisoner of war camp and $2,840.20 as compensation, at the rate of 2% per month for the seventeen-month period April 20, 1944, to September 15, 1945, based on the cost of $8,353.53 which the plaintiff contributed to the cost of new construction at said camp.

7. The defendant's counterclaim in the amount of $312.18 should be dismissed.

8. Let judgment be entered accordingly.